UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

JILL MEYER, M.D.,

                      Plaintiff,

                                                  **MEMORANDUM & ORDER**
              -against-                           12-CV-6202 (PKC)

STATE OF NEW YORK OFFICE OF MENTAL
HEALTH; CREEDMOOR PSYCHIATRIC CENTER;
and CATERINA GRANDI, M.D., Chief of Psychiatry/
Chair, Department of Psychiatry, Creedmoor
Psychiatric Center,

                      Defendants.

----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

        Before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure ("FRCP").  Plaintiff Jill Meyer ("Plaintiff"), a former employee

of Defendants State of New York Office of Mental Health ("OMH") and Creedmoor Psychiatric

Center ("CPC"), applied to, but was not hired for, certain positions advertised by Defendants

OMH and CPC and was interviewed therefor by Defendant Caterina Grandi ("Grandi")

(collectively, "Defendants").  Plaintiff sued Defendants, under a failure to hire theory, for alleged

violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human

Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL") arising out of

alleged gender, religion, and age discrimination.  For the reasons stated below, Defendants'

motion is GRANTED as to Plaintiff's Title VII claims, which must be dismissed, with prejudice.

The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law

claims, which are likewise dismissed, without prejudice.

## BACKGROUND

I.    Relevant Factual History

Plaintiff is a Jewish woman, approximately 63 years old, who received a medical degree from Ross University in 1981.  (Def. 56.1[1] ¶¶ 1, 3 (61 years old at time of 2014 deposition); Pl. 56.1 ¶¶ 3, 146.)[2]  Defendant OMH operates psychiatric hospitals and licenses various out-patient mental health services, including Defendant CPC, across New York State.  (Def. 56.1 ¶ 7.)

---

[1] Citations to "Def. 56.1" refer to Defendants' Statement of Material Facts pursuant to Local Rule 56.1.  (Dkt. 44.)  Citations to "Pl. 56.1" refer to Plaintiff's Counter-Statement of Material Facts.  (Dkt. 52.)  Citations to "Def. Resp. to Pl. 56.1" refer to Defendants' Response to Plaintiff's Counter-Statement of Material Facts.  (Dkt. 48.)

Defendants have raised a number of evidentiary objections to Plaintiff's Counter-Statement of Undisputed Facts.  (Def. Resp. to Pl. 56.1 at 1–2.)  The Court has considered these objections, though it notes that most go to the weight rather than the admissibility of Plaintiff's evidence, and finds them to be without merit as to all material facts underlying the Court's decision.  As to the numerous hearsay objections propounded by Defendants ("Objection C" in Defendants' Response (Def. Resp. to Pl. 56.1 at 2)), it is true that typically a party may not rely on hearsay evidence in supporting or opposing a summary judgment motion.  *See* Fed. R. Civ. Proc. 56(c)(2) (on a motion for summary judgment, parties may rely only on such facts as can "be presented in a form that would be admissible in evidence"); *see also Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986) (Rule 56's requirements mean that "hearsay testimony . . . that would not be admissible if testified to at the trial may not properly be set forth in [a Rule 56 Statement].") (quotation marks omitted); *Pitton v. New York City Dep't of Educ.*, No. 15-CV-1235, 2015 U.S. Dist. LEXIS 161685, at *12 n.4 (E.D.N.Y. Dec. 1, 2015) (declining to consider evidence of non-party statements because plaintiff "cannot rely on inadmissible hearsay in opposing a motion for summary judgment" and plaintiff had failed to make requisite "showing that admissible evidence will be available at trial"); *Soto v. City of New York*, No. 12-CV-4241, 2015 U.S. Dist. LEXIS 125481, at *16 n.14 (E.D.N.Y. Sept. 18, 2015) ("[H]earsay evidence may not be used to support a motion for summary judgment . . . .").  To the extent Defendants have raised a hearsay objection to evidence the Court has considered, the Court has noted its determination of that objection in each instance.

[2] The Court construes any disputed facts in the light most favorable to the non-moving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970).  However, where a party either (i) admits or (ii) denies without citing to admissible evidence facts alleged in the opposing party's Local Rule 56.1 Statement, the Court shall deem such facts undisputed.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d) ("56.1 Statement").  Thus, a standalone citation to a 56.1 Statement denotes that either the parties have, or the Court has, determined the underlying factual allegation to be undisputed.  Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein unless otherwise noted.

Plaintiff was employed at Defendant CPC from December 2004 to June 2005. (*Id.* ¶ 8.) Defendant Grandi, the Chief of Psychiatry at CPC for the past 20 years, interviewed Plaintiff for the job at CPC and, in fact, recommended that Plaintiff be hired for that job. (*Id.* ¶¶ 9, 35, 36; Pl. 56.1 ¶ 128.) As part of the hiring process, Defendants conducted a background check on Plaintiff, including a validation of her professional experience, and found nothing negative concerning Plaintiff. (Pl. 56.1 ¶¶ 130, 131.)

   a.   CPC

Plaintiff's role at CPC was that of a Psychiatrist I at CPC's Astoria Clinic. (Def. 56.1 ¶ 34.) The qualifications for a Psychiatrist I include a completed residency and possession of a license to practice, but not Board Certification, which is a requirement for a Psychiatrist II position. (*Id.* ¶¶ 24–25.)[3] A woman named Dr. Eunice D'Souza was Plaintiff's direct supervisor during Plaintiff's time at CPC. (*Id.* ¶¶ 35, 38.) Plaintiff had a "good" relationship with D'Souza and had "positive interactions" with her. (*Id.* ¶ 39.)

While at CPC, Plaintiff was also supervised by Joseph Bachner, Chief of Service of CPC's Astoria Clinic. (Def. 56.1 ¶ 40.) Plaintiff's interactions with Bachner led her to conclude that he "wasn't respectful," though she was not sure whether that was because she was a "woman or [an] M.D." (Meyer Tr.[4] at 39:11–19.)[5]

---

[3] Plaintiff is not Board Certified; she has taken the examination for such certification more than five times, but never passed. (Def. 56.1 ¶ 4.)

[4] All references to "Meyer Tr." refer to Plaintiff's deposition testimony in this case, attached by both parties in their summary judgment submissions. (*See* Declaration of Sania W. Khan in Support of Summary Judgment ("Khan Decl.") Ex. A; Declaration of Alan E. Wolin in Opposition to Summary Judgment ("Wolin Decl.") Ex. 1.) All references to "Meyer Tr. Ex. _" refer to exhibits introduced during and referenced in Plaintiff's deposition testimony, attached to the Khan Declaration. (Khan Decl. Ex. A, Exs. A, C–H, K, M.)

[5] While Plaintiff denies this and now alleges decisively, in her 56.1 Statement in

3

Plaintiff did not typically interact with Grandi, other than in Grand Rounds, which are group lectures for medical professionals held once a week at CPC. (Def. 56.1 ¶ 44.) However, Plaintiff described her interactions with Grandi as "positive." (Meyer Tr. at 37:8–14.) Grandi never made any comments to Plaintiff about her gender during Plaintiff's employment with CPC. (*Id*. at 54:4–6.)

Plaintiff's coworkers at CPC were "aware that [she] was Jewish" and that she "took [days] off for the Jewish holidays, [the] High Holy Days," but Plaintiff "never discussed it" with them. (*Id*. at 45:5–14.) Plaintiff did not know of any other Jewish employees with whom she worked at CPC. (*Id*. at 46:14–19.)[6] Grandi was raised a Roman Catholic. (Pl. 56.1 ¶ 149.) In December 2004, when Plaintiff first began working at CPC, she attended CPC's Christmas party, at which both Grandi and D'Souza commented that it was "known that [Plaintiff] do[es]n't

---

opposition to summary judgment, that Bachner's alleged disrespectful attitude "was because plaintiff was a female" (Pl. 56.1 ¶ 41), she testified at her deposition that she "didn't know if [the disrespect] was because [she] was a woman or [she] was the M.D." (Meyer Tr. at 39:11–19.) Because Plaintiff's factual allegations regarding Bachner's conduct "are made for the first time in plaintiff's affidavit opposing summary judgment" and "contradict[] [plaintiff's] own prior deposition testimony," the Court need not credit those allegations as creating a factual dispute. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001); *see also Bickerstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that . . . contradicts the affiant's previous deposition testimony.") (quotation marks omitted).

The Court has not considered a number of Plaintiff's other assertions regarding Bachner. (*See* Pl. 56.1 ¶¶ 138, 139.) The Court finds that these allegations are based on inadmissible hearsay, namely comments made to Plaintiff by a female doctor and a female social worker with whom Plaintiff worked and/or was acquainted at CPC, which Plaintiff proffers for their truth, that Bachner was biased against women.

[6] Plaintiff testified contrary to this, in that she testified that a social worker she knew at CPC "had made reference that it was tough being a Jewish female in passing," which Plaintiff took to mean that the social worker "felt that she stood out" and "[t]hat there was a minority of that ethnic background." (Meyer Tr. at 194:20–195:9.) However, the Court has not considered this testimony here, as Plaintiff's testimony is based on the comment of a non-party submitted for the truth of the matter (that it was tough being a Jewish female at CPC and/or that CPC's workforce had only a minority of Jewish females), rendering the evidence inadmissible hearsay.

celebrate Christmas." (Meyer Tr. at 200:5–201:4; Pl. 56.1 ¶ 147.)[7] Grandi disputes making any statements to Plaintiff regarding Plaintiff's religion. (Def. 56.1 ¶ 52.) In addition, "[d]uring the latter part of [Plaintiff's] employment at [CPC], around Passover in the spring [of 2005]," D'Souza "acknowledged that [Plaintiff] was Jewish." (Meyer Tr. at 180:2–15; Pl. 56.1 ¶ 144.)[8] Plaintiff did not "have any exact statements that were made" regarding her religion while she worked at CPC "beyond stating or mentioning the holidays that [Plaintiff] took off"; she just recalled "reference[s]" to her Judaism. (Meyer Tr. at 181:8–182:5.)

At CPC, newly hired psychiatrists are subject to a one-year probationary period, during which they are to receive a performance evaluation every three months, culminating in one report at the end of the year to determine whether they have passed probation. (Def. 56.1 ¶¶ 32, 33; Pl. 56.1 ¶¶ 151–53.) Consistent with this practice, after starting in December 2004, Plaintiff received an initial evaluation in February 2005, signed by Plaintiff on February 7, 2005 and by Grandi on February 9, 2005. (Def. 56.1 ¶ 45; Pl. 56.1 ¶ 155; Meyer Tr. Ex. D.) In that evaluation, out of three possible scores of "good," "average," or "unsatisfactory," Plaintiff was evaluated as "good" in "relationships with people," "attendance and punctuality," and "cooperation and training," and as "average" in both "quantity" and "quality of work," her "work

---

[7] Plaintiff's testimony on this issue is contradictory. When Plaintiff was asked whether Grandi "ever ma[d]e any comments to [Plaintiff] about [her] religion" during her employment with CPC, Plaintiff replied "No." (Meyer Tr. 54:10–12.) However, the Court "resolve[s] [this] ambiguit[y] and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought," in this case, Plaintiff. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir. 1997).

[8] Defendants have asserted hearsay objections against Plaintiff's assertions regarding D'Souza's statements about Plaintiff's religion. (Def. Resp. to Pl. 56.1 ¶¶ 144, 147.) This evidence is not hearsay, however, as it is not offered for its truth; the statements made by D'Souza are not offered to prove that Plaintiff is, indeed, Jewish, and/or that Plaintiff does not, in fact, celebrate Christmas. Rather, the statements are offered as part of Plaintiff's proffer that the decision not to hire her in 2011 was motivated by discrimination against her on the basis of her religion.

habits and interests," and "resourcefulness and leadership qualities." (Pl. 56.1 ¶ 158; Meyer Tr. Ex. D.) The "overall impression" of Plaintiff was "average," and it was recommended that her probationary period be continued. (*Id.*)

Throughout Plaintiff's employment at CPC, Grandi had verbal conversations with D'Souza regarding Plaintiff's performance, with D'Souza characterizing Plaintiff as being overwhelmed, disorganized, and not able to deal with the patients she had to see. (Def. 56.1 ¶¶ 46, 47.)[9] In addition, after Plaintiff's February 2005 evaluation, D'Souza informed Grandi of an incident where Plaintiff prescribed medication for a patient but wrote down the wrong name on the prescription. (Def. 56.1 ¶ 48; Grandi Decl.[10] ¶ 16.) Plaintiff denies that this incident occurred. (Pl. 56.1 ¶ 48.) Plaintiff also disputes Defendants' characterization of her work, arguing that she was not disorganized and was not overwhelmed, among other things. (Pl. 56.1 ¶¶ 46, 132.)[11] Other than D'Souza, Grandi did not speak to anyone else regarding Plaintiff's job performance at CPC, including Bachner. (Pl. 56.1 ¶ 165; Grandi Tr. at 62:4–11.) Moreover,

---

[9] Grandi alleges that she received these reports from D'Souza even in advance of Plaintiff's February 7, 2005 evaluation (Grandi Tr. at 60:8–11), though Plaintiff was not scored as "unsatisfactory" in any category on her evaluation, nor were there any written comments indicating poor performance (Pl. 56.1 ¶ 159; Meyer Tr. Ex. D.). Grandi acknowledged that the written comments section of the evaluation was to denote "if the performance is unsatisfactory." (Grandi Tr. at 61:2–6.) All references to "Grandi Tr." refer to Defendant Grandi's deposition testimony in this case. (Wolin Decl. Ex. 2.)

[10] All references to "Grandi Decl." refer to the Declaration of Caterina Grandi, M.D., in support of Defendants' motion for summary judgment. (Dkt. 45-2.)

[11] Plaintiff has proffered facts/evidence disputing Defendants' characterization of her work performance (*see* Pl. 56.1 ¶¶ 133–36) that the Court has not considered, as they are inadmissible hearsay. *See supra* n.1. Plaintiff offers the statements of a variety of non-parties, including D'Souza, for their truth, namely that Plaintiff's job performance was exemplary. There is no evidence in the record that any of these statements and/or evaluations of Plaintiff's job performance were communicated to Grandi (in contrast to D'Souza's statements directly *to* Grandi, submitted by Defendants), and therefore Plaintiff's proffered evidence has no bearing on Grandi's knowledge and/or state of mind at the time of her failure to hire Plaintiff in 2011, the only relevant issue here.

Grandi had no knowledge of any complaints about Plaintiff other than what she heard from D'Souza. (Pl. 56.1 ¶ 166; Grandi Tr. 62:24–63:5.) Plaintiff received no written document concerning her job performance, nor was she counseled, during her time at CPC, other than her February 2005 evaluation. (Pl. 56.1 ¶¶ 154, 160, 161.)

In May 2005, Plaintiff was due for a second evaluation under CPC's guidelines for the probationary year. (Pl. 56.1 ¶ 156; Grandi Tr. at 48:19–49:4.) She did not receive one, however, before she resigned on May 13, 2005. (Def. 56.1 ¶ 54; Pl. 56.1 ¶¶ 156, 157; Grandi Tr. 49:5–22.) Defendants allege that Plaintiff resigned because D'Souza informed her that she was going to fail probation. (Def. 56.1 ¶¶ 53, 54; Grandi Tr. at 63:10–14; Grandi Decl. ¶ 19.) There is nothing in writing indicating that Plaintiff was placed on notice that she was failing probation. (Pl. 56.1 ¶ 163.) Plaintiff denies that she was so informed and alleges that she resigned because, after she had initially been approved to provide weekend coverage ("moonlighting"), Grandi abruptly withdrew that approval hours before Plaintiff was to being her first moonlighting shift. (Pl. 56.1 ¶¶ 49, 50, 53; Meyer Tr. at 38:3–13.)[12] Plaintiff was not informed of the decision by Grandi herself. (Def. 56.1 ¶¶ 50, 51; Meyer Tr. at 50:16–51:15.) Plaintiff alleges that this was what caused her to feel "at all discriminated against while working at [CPC]." (Meyer Tr. at 37:20–39:10; Pl. 56.1 ¶ 162.) According to Plaintiff, she "left because [she] was very disappointed in the not having the moonlighting [sic], the extra service, and [she] decided to leave in good standing." (Meyer Tr. at 51:21–52:2.)

After Plaintiff's resignation, Grandi alleges that Plaintiff was not considered rehirable, "[b]ecause [Grandi] felt [Plaintiff] was not competent in providing psychiatric coverage in an

---

[12] Plaintiff worked "[a]s a moonlighter" at Elmhurst Hospital "between March of 2005 to July of 2005," but stopped because Plaintiff "just didn't like it" and she "didn't get paid very much." (Meyer Tr. at 130:16–22, 132:15–133:2.)

outpatient setting," based upon Grandi's conversations with D'Souza. (Grandi Tr. at 64:3–13; Pl. 56.1 ¶ 168.) This determination was not put in writing. (Grandi Tr. at 64:14–17; Pl. 56.1 ¶ 167.)

### b. Jacoby Medical Center ("Jacoby")[13]

After Plaintiff resigned from CPC in May 2005, she worked at Jacoby, where she was employed as a staff psychiatrist for approximately six weeks. (Def. 56.1 ¶ 80; Meyer Tr. at 54:18–55:4, 55:17–19.) She left because she "didn't like it at all" and "missed [] public psychiatry." (Meyer Tr. at 55:20–24.)

### c. Bronx Psychiatric Center ("BPC")

In July 2005, Plaintiff went from Jacoby to BPC,[14] controlled and operated by OMH like

---

[13] The spelling of "Jacoby" varies in the summary judgment submissions. (*Compare* Def. 56.1 ¶ 80 ("Jacobi"), *with* Meyer Tr. at 54:21–22 ("Jacoby").) The Court has used the spelling used by the court reporter transcribing Plaintiff's deposition ("Jacoby").

[14] The Court's summary of Plaintiff's employment at BPC is relatively brief, for two reasons. First, the evidence submitted by both parties is predominantly inadmissible hearsay, consisting of non-party statements, primarily made and/or written to Plaintiff, submitted for their truth to demonstrate, *inter alia*, Plaintiff's alleged job performance at BPC and the circumstances of her resignation therefrom. There is no relevant hearsay exception, and the Court has therefore not considered this evidence in resolving the instant motion. (*See, e.g.,* Pl. 56.1 ¶¶ 182, 183, 186–88, 190, 192, 193; Def. 56.1 ¶¶ 66–72; Meyer Tr. Exs. F, G, K, M.)

Second, and more fundamentally, by Plaintiff's own admission, her employment and departure from BPC could not have had any bearing on Defendants' failure to hire her for the positions for which she applied in June 2011, and is therefore immaterial to the instant motion. Grandi "was the recommending official with reference to the[] vacancies" for which Plaintiff applied in 2011, and "[a]ll of her recommendations were followed by the Executive Director." (Pl. 56.1 ¶ 200.) But Grandi "did not learn that [P]laintiff had even been employed at BPC until the 2011 interview when [P]laintiff told her," "had no knowledge of [P]laintiff's employment at BPC or anything having to do with it," and "never communicated with anyone concerning [P]laintiff's employment at BPC and had no knowledge as to how it ended," such that "Plaintiff's employment experience at BPC could not have been a factor in Dr. Grandi's decisionmaking process with reference to the subsequent applications." (Pl. 56.1 ¶¶ 211–14; Def. 56.1 ¶ 102.)

Plaintiff's BPC-related evidence appears targeted towards a hostile work environment claim. (*See, e.g.,* Meyer Tr. at 206:2–17 (describing basis for her complaints regarding BPC and

CPC, and run by Dr. Leroy Carmichael, the Executive Director. (Def. 56.1 ¶¶ 6, 55, 58; Meyer Tr. at 57:9–15.) In connection with Plaintiff's application to BPC, Grandi completed a reference inquiry to verify Plaintiff's past affiliation with CPC. (Wolin Decl. Ex. 4; Pl. 56.1 ¶ 169.) In that form, Grandi checked "No" as to whether there had been any clinical privileges, employment, or association denied, limited, or terminated for alleged misconduct or malpractice. (*Id.*)[15] Grandi could not explain why Plaintiff was hired by BPC, also part of OMH, if she was considered not rehirable by CPC. (Pl. 56.1 ¶ 167.)

Plaintiff was initially employed as a psychiatrist on the Spanish-speaking unit. (Def. 56.1 ¶ 55; Meyer Tr. at 57:16–19.) Dr. Nigel Bark was the chief of that unit and supervised Plaintiff, along with Dr. Joseph Battaglia. (Def. 56.1 ¶¶ 56, 57.) Plaintiff did not work with any other female physician. (Pl. 56.1 ¶ 170.) No one with whom Plaintiff worked on the treatment team at BPC ever made comments to her about her gender, other than generalized comments that a male doctor would not be as fearful of agitated patients from a safety perspective. (Meyer Tr. at 75:3–24.)[16]

---

[15] fact "that no similarly situated psychiatrist was treated in the same manner" as the "ongoing, from day one, inappropriate hostile environment [created by] the supervising psychiatrist, Dr. Bark, at BPC . . . ."); *see also* Dkt. 53 at 17 ("the whole history of dealings between plaintiff and defendants, which . . . created a hostile work environment, are probative to the issue of inference.").) To the extent Plaintiff seeks to bootstrap her remaining Title VII claims on such allegations of a hostile work environment, this is unavailing, as the hostile work environment aspect of Plaintiff's Title VII claims was dismissed in this Court's Order of May 2, 2014. (Dkt. 26 at 11–13.)

[15] Grandi also checked "No" in answer to whether Plaintiff had "ever resigned or withdrawn association or privileges [sic] or avoid [sic] imposition or disciplinary measures." (Wolin Decl. Ex. 4; Pl. 56.1 ¶ 169.) But both parties acknowledge that Plaintiff resigned from CPC on May 13, 2005. (Pl. 56.1 ¶ 54; Def. 56.1 ¶ 54.)

[16] Defendants have asserted hearsay objections to this evidence proffered by Plaintiff, but again, this misconceives the purpose for which this evidence was submitted; these statements were not proffered for their truth, that male doctors really would be less fearful of agitated

There were no other Jewish members of the treatment team on which Plaintiff was initially staffed at BPC, nor were there any "other female Jewish older psychiatrists." (Pl. 56.1 ¶ 171; Meyer Tr. at 64:11–14, 206:2–17.) There was, however, one Jewish doctor "in charge of the physician union." (Meyer Tr. at 195:13–17.) Hilda Alfarro, the head nurse at BPC, "was aware that [Plaintiff] was Jewish" and made reference to that fact "[w]ithin the first couple of weeks" of Plaintiff's employment at BPC, though Plaintiff "d[id]n't know the exact" statement Alfarro made, only that she "made reference." (*Id*. at 65:4–66:2; Pl. 56.1 ¶¶ 172–74.)[17] Alfarro made "some reference [] when [Plaintiff] took time off for the High Holy Days that following fall after [she] started in July [2005]," but Plaintiff "can't give [] specifics," only that Alfarro "knew [Plaintiff] was Jewish and there was reference made." (Meyer Tr. at 74:10–20; Pl. 56.1 ¶¶ 172–74.)[18] Plaintiff could not recall whether Alfarro ever stated anything to Plaintiff about her gender. (Meyer Tr. at 72:5–8; *see also id*. at 70:13–71:2, 71:23–72:4 (describing Alfarro as "just a very negative person," without "specifics").)

Within two weeks of being employed at BPC, Alfarro permitted a dangerous patient to escape to an area in which the patient interacted with Plaintiff, rendering Plaintiff terribly scared. (Pl. 56.1 ¶ 181.) Plaintiff alleges that during her time at BPC, the staff was disrespectful towards

patients, but rather to demonstrate alleged gender-based discrimination against Plaintiff while employed at an OMH-controlled hospital. *See supra* n.8.

[17] When asked what kind of reference Alfarro made to Plaintiff's Judaism, Plaintiff responded that "[s]he knew I was Jewish." (Meyer Tr. at 66:6–17.) Plaintiff also testified, in response to a question regarding whether Alfarro "ever sa[id] anything to [Plaintiff] about [Plaintiff's] religion," that Alfarro "was negative" and "had poor interaction[s] with other staff, other doctors . . . mainly female." (*Id*. at 71:15–22.)

[18] Defendants have asserted hearsay objections to this evidence proffered by Plaintiff, but again, this misconceives the purpose for which this evidence was submitted; these statements were not proffered for their truth, that Plaintiff is Jewish and/or took time off for the High Holy Days, but rather to demonstrate alleged discrimination against Plaintiff while employed at an OMH-controlled hospital. *See supra* n.8.

her and Bark did nothing to correct that conduct; in fact, Bark himself was degrading and disrespectful toward Plaintiff, reprimanding her in front of other team members during meetings. (*Id.* ¶ 185.) BPC employees had made remarks about Plaintiff's Spanish, saying that Plaintiff did not sound "native." (*Id.* ¶ 178.) Eventually, after the incident with the patient, Alfarro and Bark signed a petition requesting that Plaintiff be transferred out of the Spanish-speaking unit, citing Plaintiff's Spanish as the reason for the requested transfer. (Def. 56.1 ¶¶ 59, 60; Pl. 56.1 ¶ 184.) On Plaintiff's request, she was transferred from the Spanish-speaking unit into a co-ed adult unit. (Def. 56.1 ¶ 63; Pl. 56.1 ¶ 186.) Plaintiff was then transferred, in September 2006, to an all-male high security unit, and then, in December 2006, to the admissions unit. (Def. 56.1 ¶ 65; Pl. 56.1 ¶ 189.) Plaintiff resigned from BPC in January of 2007.[19] (Meyer Tr. at 116:6–8.)

### d. Other Employment

After her departure from BPC, Plaintiff transitioned to working full-time as a staff psychiatrist at Bronx Lebanon, where she had worked part-time since November 2005. (Def. 56.1 ¶ 82; Meyer Tr. at 116:6–24.) She stayed there until February 2008, when she resigned because she wanted a more academic position. (Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82; Meyer Tr. at 121:20–25.)

From Bronx Lebanon, Plaintiff went to Staten Island University Hospital in March 2008, to act as a full-time consultation liaison. (Def. 56.1 ¶ 83; Meyer Tr. at 122:2–11.) She left in June 2010, because of the commute. (Def. 56.1 ¶ 83; Meyer Tr. at 122:19–123:3.)

Plaintiff then opened her own private practice as a consultation liaison, an "outpatient

---

[19] There is some dispute in the record as to whether Plaintiff resigned or was terminated from BPC, namely Plaintiff's testimony that she filed suit against BPC for allegedly inappropriate termination, seeking reinstatement. (Meyer Tr. at 104:6–21.) However, both parties refer to her resignation from BPC (*id.* at 116:6–8; Def. 56.1 ¶ 73), and Defendants have submitted Plaintiff's resignation letter, dated January 9, 2007 (Meyer Tr. Ex. H).

consult," and began providing private physician services at New York Hospital. (Def. 56.1 ¶ 84; Meyer Tr. at 123:10–25, 125:6–13.) She also conducted private practice out of Mount Sinai Hospital. (Def. 56.1 ¶ 85; Meyer Tr. at 125:14–22.) Beginning in January 2010, Plaintiff also began work at Margaret Tietz Nursing Home as a consultant gero-psychiatrist, and continued until November 2010, when she resigned. (Def. 56.1 ¶ 86; Meyer Tr. at 126:6–15; 126:24–127:2.) After her resignation, Plaintiff moved to Dry Harbor Nursing Home, working as a consultant for approximately six or seven months before her services were terminated, which Plaintiff attributes to the hospital retaining a consulting group and not hiring solo psychiatrists any longer. (Def. 56.1 ¶ 87; Meyer Tr. at 127:3–21.) Plaintiff was also employed for between seven to ten days at Interfaith Medical Center, but resigned because she "didn't really like it"; it "wasn't [her] cup of tea," in that she alleges the hospital was in early stages of bankruptcy and did not render good care. (Def. 56.1 ¶ 91; Meyer Tr. at 133:3–23.)

Throughout much of Plaintiff's employment history, from March 2004 through April 2013, Plaintiff had voluntary privileges at Northshore Hospital that were renewed every two years, but in April 2013, her privileges were not renewed; Plaintiff was "not really sure [of] the reason." (Def. 56.1 ¶ 88; Meyer Tr. at 127:22–128:20.) In addition, Plaintiff applied for a series of jobs for which either her interviews were cancelled or her offers of employment were withdrawn. In 2009, Plaintiff applied for a job with the Syracuse Veterans Administration, was offered the job and accepted it, but then had the offer "taken back," though she is "not really certain why." (Def. 56.1 ¶ 92; Meyer Tr. at 134:4–18.) Plaintiff also applied for and was offered "an excellent job" at an institution called Montefiore, which was then also "taken back." (Def. 56.1 ¶ 95; Meyer Tr. at 144:9–16.) Plaintiff believes this offer was rescinded because BPC "responded negative [sic] to [a] reference and maybe [an] off the record reference [sic] since Dr.

Bark and Dr. Bat[t]aglia were very active" at that institution. (Meyer Tr. at 144:17–25.) Plaintiff also applied to a job at Nassau University Medical Center and was scheduled for an interview that was later cancelled, though Plaintiff did not know why. (*Id.* at 155:14–23.)

Plaintiff "attribute[s] [her] many short employments to" the fact that she has "been dissatisfied with the quality of the care rendered," as she "do[es]n't want to be in the situation where the quality of care is not appropriate." (*Id.* at 162:13–20.) That is Plaintiff's "opinion of all the places that [she has] worked," as she alleges that she has "always left in good standing." (*Id.* at 162:21–24.)

     e.   2011 Application for Advertised CPC Positions

Since Plaintiff's employment with CPC and BPC, Plaintiff has applied to various mental health facilities under the control and operation of OMH. (Pl. 56.1 ¶ 195.) Plaintiff was never hired for any such position. (*Id.* ¶ 196.) Plaintiff alleges that she has been duly qualified for the numerous vacancies for which she has applied, which Defendants dispute. (*Compare* Pl. 56.1 ¶ 196, *with* Def. Resp. to Pl. 56.1 ¶ 196.)

In June 2011, CPC advertised that it was seeking two full-time psychiatrists, one for CPC's Steinway Clinic and another for its Assertive Community Treatment Program. (Pl. 56.1 ¶ 197.) Plaintiff alleges that she applied for these positions as a Psychiatrist I (*Id.* ¶ 199), while Defendants argue that she applied for Psychiatrist II positions (Def. 56.1 ¶¶ 97, 98). Defendants allege that they were looking for candidates with Board Certification, because they assert this indicates better qualifications. (Grandi Decl. ¶ 22.) It is undisputed, however, that the advertised requirements for the positions were a New York State medical license and completion of an approved psychiatry residency; Board Certification was not an advertised requirement. (Pl. 56.1 ¶ 198.) The advertised positions directed all interested parties to contact Grandi. (*Id.* ¶ 198.)

Plaintiff applied and was interviewed for these positions by Grandi and a female Human Resources representative. (Def. 56.1 ¶ 99; Meyer Tr. at 165:11–24.) As Chief of Psychiatry at CPC, Grandi has the authority to review resumes for applicants and decide who should be interviewed to fill psychiatric vacancies. (Def. 56.1 ¶ 26.) The interview process typically proceeds as follows: Grandi interviews applicants, together with the supervisor of the unit with the open position, after which both the supervisor and Grandi make recommendations to the Clinical Director of CPC, who accepts or rejects those recommendations. (*Id*. ¶¶ 28–30.) The Executive Director of CPC then makes the final decision of whether to hire the applicant. (Def. 56.1 ¶ 31; Pl. 56.1 ¶ 129.) Grandi is unaware of a situation in which her hiring recommendation has not been followed by the Executive Director. (Grandi Tr. at 33:17–20; Pl. 56.1 ¶ 129.)

While Grandi's approach is typically to interview everyone with an acceptable *curriculum vitae* (Def. 56.1 ¶ 27), Grandi only interviewed Plaintiff in 2011 for the advertised positions because she was directed to do so by OMH (Pl. 56.1 ¶ 204). Prior to the interview, Grandi knew that she was not going to consider Plaintiff. (*Id*. ¶¶ 202, 205.)

During the interview, Plaintiff described to Grandi her past employment at Jacoby, BPC, Bronx Lebanon, and Staten Island University Hospital. (Def. 56.1 ¶¶ 100, 101; Meyer Tr. at 170:13–22.) Grandi made no mention in the interview of any Board Certification requirement for the positions. (Pl. 56.1 ¶ 206.)[20]

After the interview, Plaintiff contacted Grandi because she had not received word regarding her applications. Plaintiff alleges Grandi told her she was an "excellent candidate" but that CPC was "going to look further." (*Id*. ¶ 207.) Defendants dispute that Grandi ever told

_____

[20] CPC currently employs 54 psychiatrists, including both Pyschiatrists I and II; approximately 30% of those currently employed are Psychiatrist I, meaning they are not Board Certified. (Pl. 56.1 ¶ 216.)

Plaintiff she was an excellent candidate. (Grandi Decl. ¶ 28.)[21]

Ultimately, Dr. Zinaida Yel, a female doctor who is Board Certified, was hired for the position at CPC's Steinway Clinic. (Def. 56.1 ¶ 107.) Dr. Haniel Shen, a male doctor who had a history of managing a large caseload of psychiatric patients, was initially hired for the Assertive Community Treatment Program position, but resigned in August 2012 and was replaced by Dr. Alan Jaffe, a male doctor who is Board Certified. (Id. ¶¶ 108, 109.) While Plaintiff asserts that she was just as qualified for these positions as the candidates ultimately hired (Pl. 56.1 ¶ 217), Defendants dispute this (Def. Resp. to Pl. 56.1 ¶ 217). Defendants allege that Plaintiff was not hired because of her previous employment history at CPC and because the candidates ultimately hired were better qualified. (Def. 56.1 ¶ 105; Grandi Decl. ¶¶ 29, 30.)

Plaintiff "can't recall" whether anyone in the 2011 interview process, including Grandi, made any statement regarding Plaintiff's gender. (Meyer Tr. at 172:17–20, 188:4–22.) When asked "why [she] believe[s] [she] w[as] discriminated again[st] based on [her] gender," Plaintiff responded that she "was an excellent candidate . . . having done an excellent job for the six, seven, months that [she] was at [CPC] previously [and] should have been an excellent candidate and should have been offered the job since . . . [she] made all the qualifications." (Id.) (See also id. at 199:15–200:4 (When asked why Plaintiff "believe[s] that Dr. Grandi discriminated against [Plaintiff] based on [her] gender," Plaintiff responded that she "just felt that," that she "think[s]

---

[21] Plaintiff also spoke to Grandi after the 2011 interview about vacancies other than the two for which Plaintiff had applied. (Pl. 56.1 ¶ 208.) Plaintiff alleges that, as to one such advertised vacancy, Grandi advised her not to apply. (Id. ¶ 210.) Defendants dispute this, citing portions of Grandi's deposition transcript (Def. Resp. to Pl. 56.1 ¶ 210), but because these portions of Grandi's deposition do not appear to have been submitted by either party, and the Court "cannot locate the evidence," the Court has not considered Defendants' statement. See Arnone v. Aetna Life Ins. Co., No. 13-CV-5168, 2015 U.S. Dist. LEXIS 82768, at *2 n.1 (E.D.N.Y. June 25, 2015) ("Where there is no citation or the Court cannot locate the evidence, those statements shall not be considered.").

[Grandi] should have hired [Plaintiff]," and that Grandi "wasn't able to give [a] good reason . . . why she wasn't accepting [Plaintiff].").)

Regarding Grandi's alleged religious bias, Plaintiff claims that Grandi "made some reference" "in passing about [Plaintiff] coming from a Jewish family" in the 2011 interview. (Meyer Tr. at 180:2–24.) She also vaguely asserts that, "[t]hey knew [she] was Jewish. They knew that [she] was a hard working [sic] – interested in earning more funds. There was reference to [her] religion. There was reference to [her] ethnic background of hard working, . . . [and being] interested in earning extra finances. And . . . there was the flavor of anti-Semitism." (*Id*. at 188:23–189:11.) Plaintiff does not know the religion of the individuals who filled the positions for which she applied in 2011. (*Id*. at 189:12–16.)

Defendants dispute Plaintiff's claim that Grandi referenced Plaintiff being Jewish. (Def. Resp. to Pl. 56.1 ¶ 148; Grandi Decl. ¶ 27.) Plaintiff's deposition testimony also contradicts this assertion on multiple occasions. For example, when asked whether Grandi "ma[d]e any comments about [her] religion in the interview," Plaintiff responded, "No. But she was well aware from my previous employment at Creedmoor that I was Jewish and modern orthodox." (Meyer Tr. at 172:21–25.) When asked whether "there [were] any statements during the [2011] interview process made with regard to [her] religion," Plaintiff responded, "I don't recall." (*Id*. at 189:17–20.)

## II.  Relevant Procedural History

Plaintiff filed this action on December 18, 2012 (Dkt. 1) and, upon agreement of the parties in light of Defendants' proposed motion to dismiss (Dkt. 10), Plaintiff filed an amended complaint on March 25, 2013 (Dkt. 11). Defendants moved to dismiss the amended complaint on July 12, 2013 (Dkt. 16), and on May 2, 2014, the Court granted that motion in part and denied

it in part, dismissing Plaintiff's claims under the Age Discrimination in Employment Act ("ADEA") and the hostile work environment aspect of her Title VII claims, but permitting the remainder of Plaintiff's federal and State law claims to proceed (Dkt. 26).

*LEGAL STANDARD*

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one part must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party will be insufficient; rather, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation marks omitted) (alterations in original); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation") (quotation marks omitted); *see also Miner v. Clinton Cty.*, 541 F.3d 464, 471 (2d Cir. 2008) (nonmoving party must offer

"some hard evidence showing that its version of the events is not wholly fanciful") (quotation marks omitted).  In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation marks omitted) (emphasis in original).

In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970).  Moreover, in the context of employment discrimination claims, "an extra measure of caution" is warranted before granting summary judgment, particularly with respect to the consideration of "circumstantial evidence," as "direct evidence of discriminatory intent is rare." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001).  Even in the discrimination context, however, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .") (emphasis in original).

## *DISCUSSION*

I.     Title VII Claims against Defendants OMH and Creedmoor

Plaintiff alleges that Defendants OMH and Creedmoor violated Title VII by discriminating against her in hiring on the basis of her gender and her religion.  (Dkt. 11 ¶¶ 74–80 (Count 4), 95–101 (Count 7).)

Title VII prohibits discrimination in employment based upon certain protected characteristics, including gender and religion. 42 U.S.C. § 2000e-2. Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" based on a protected characteristic. *Id*.

To make out a Title VII claim, a plaintiff must meet the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* (*McDonnell Douglas*), 411 U.S. 792, 802–05 (1973). First, she must establish a *prima facie* case of discrimination. *Id*. at 802; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). Her burden at this first step is "not onerous," *Tex. Dep't of Cmty. Affairs v. Burdine* (*Burdine*), 450 U.S. 248, 253 (1981), and "minimal," at best, *St. Mary's Honor Ctr. v. Hicks* (*Hicks*), 509 U.S. 502, 506 (1993). With respect to a discrimination claim based on a failure to hire, a plaintiff must establish by a preponderance of the evidence that "she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine* at 253.

Second, once the plaintiff has established a *prima facie* case, the burden shifts to the defendants "to articulate some legitimate, nondiscriminatory reason" for their adverse employment decision, which (if satisfied) rebuts the "presumption" of employment discrimination created by the plaintiff's *prima facie* case. *Burdine*, 450 U.S. at 253, 255–56 (quotations omitted); *see also Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) ("After a plaintiff demonstrates a *prima facie* case of [] discrimination, the defendant must produce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.") (quotation marks omitted) (emphasis in

original); *Hicks*, 509 U.S. at 506–07 (describing the "presumption" as a "conclusion [of employment discrimination] in the absence of explanation," which the defendants' "explanation" rebuts).

Third, the plaintiff must bear the entire burden of proving that the defendants' nondiscriminatory reasons were mere "pretext for discrimination," thus establishing that she was, in fact, discriminated against. *Burdine*, 450 U.S. at 253, 256. The plaintiff need only prove that her protected characteristic was a "motivating factor" that contributed to, even if it was not determinative of, the adverse employment decision. *Desert Palace, Inc. v. Costa* (*Costa*), 539 U.S. 90, 94 (2003) (quoting 42 U.S.C. § 2000e-2(m)).[22]

### A. Plaintiff's Gender-Based Discrimination Claim: No *Prima Facie* Case Established

Plaintiff must first establish four elements to make out a *prima facie* case of discrimination based on a failure-to-hire theory: (1) she is a member of a protected class; (2) she is qualified for the positions to which she applied; (3) she suffered an adverse employment action; and (4) there exist circumstances that give rise to an inference of discrimination. Defendants do not dispute the first three prongs.[23] Accordingly, the Court addresses only the

_____

[22] Though the defendants may prove, as a "limited affirmative defense" to mitigate damages, that they "'would have taken the same action in the absence of the impermissible motivating factor[,]'" *Costa*, 539 U.S. at 94–95 & n.2 (quoting 42 U.S.C. § 2000e-5(g)(2)(B)), proof of this affirmative defense does not, in itself, establish defendants' entitlement to summary judgment on liability.

[23] The parties' Rule 56.1 Statements suggest a dispute about whether Plaintiff was qualified for the position for which she applied. (*See* Def. 56.1 ¶¶ 97, 98; Pl. 56.1 ¶ 199; Def. Resp. to Pl. 56.1 ¶ 199.) However, to satisfy the second prong of the *prima facie* case, a plaintiff need only establish "basic eligibility for the position at issue," as defined by the employer. *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 81 (2d Cir. 2009) (quotation marks omitted). It is undisputed that "[t]he advertised requirements for the positions [to which Plaintiff applied] were a New York State Medical License and the completion of an approved psychiatry residency." (Pl. 56.1 ¶ 198; Def. Resp. to Pl. 56.1 ¶ 198.) It is similarly undisputed that Plaintiff was eligible under those requirements. (Def. 56.1 ¶¶ 24, 34.) Moreover, in their moving papers, Defendants acknowledge that only the fourth prong is at issue. (Dkt. 43 at 15 (arguing that

fourth element of Plaintiff's *prima facie* case, *i.e.*, whether there exist circumstances giving rise to an inference of discrimination.

An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).[24] Here, there is no evidence in the record from which a rational factfinder could infer gender-based discrimination in Defendants' failure to hire Plaintiff in 2011.

Plaintiff's only allegations with respect to gender are that she "did not work with any other female" other than D'Souza, Grandi, and some nurses during her time at CPC, that "[t]here were no other Jewish female older Psychiatrists at CPC or BPC," and that she "did not work with any other female physician" at BPC. (Pl. 56.1 ¶¶ 140, 143, 170.) These facts are insufficient to sustain an inference of gender-based discrimination.

---

Plaintiff fails to establish a *prima facie* case of discrimination "because she has not presented any facts which show the failure to hire her *occurred under circumstances giving rise to an inference of discrimination*") (emphasis added); *id.* ("assuming for purposes of [Defendants'] motion that Plaintiff can satisfy the other three elements" and therefore arguing only as to "the fourth element").) Therefore, the Court finds no genuine issue of material fact as to the second prong of the *prima facie* case.

[24] Plaintiff argues in her Opposition that "the whole history of dealings between plaintiff and defendants, which . . . created a hostile work environment, are probative to the issue of inference." (Dkt. 53 at 17.) However, *generalized evidence of a hostile work environment cannot be used to support an inference of discrimination where that evidence is not attributable to the actors accused of engaging in the gender-based discrimination that resulted in the failure to hire. See supra* n.14 (hostile work environment evidence related to BPC).

1.      Alleged Discriminator in Protected Class

It is a well-settled, albeit not dispositive, principle that where the alleged discriminator is a member of the same protected class as Plaintiff, an inference against discrimination exists and claims of discrimination become less plausible.  *See, e.g., Allen v. Chanel, Inc.*, No. 12 Civ. 6758, 2015 U.S. Dist. LEXIS 84255, at *13 (S.D.N.Y. June 26, 2015) (granting summary judgment on sex discrimination claim because "when the decision-maker is in the same protected class(es) as the plaintiff-employee, courts can draw inferences against discriminatory intent," and here the decision makers were "all female" just like plaintiff); *Palak v. St. Francis Hosp.*, No. 14-CV-4383, 2015 U.S. Dist. LEXIS 76511, at *20–21 (E.D.N.Y. June 12, 2015) (collecting cases for proposition that it "provides an additional inference against discrimination" "where the person who participated in the allegedly adverse decision is also a member of the same protected class") (quotation marks omitted).  Plaintiff acknowledges that Grandi, a woman, "was the recommending official with reference to the[] vacancies" for which Plaintiff applied in 2011, and "[a]ll of [Grandi's] recommendations were followed by the Executive Director."  (Pl. 56.1 ¶ 200.)  D'Souza, Plaintiff's direct supervisor, whose evaluation of Plaintiff's job performance is alleged to have impacted Grandi's decision not to hire Plaintiff in 2011, is also a woman.  While it is true that "discriminatory conduct may be perpetrated by members of a protected class against other members of that same class," both Grandi's and D'Souza's "status as [women] . . . certainly undercuts Plaintiff's efforts to contend that there are disputed issues of material fact concerning her ability to prove a *prima facie* case of discrimination" based on gender.  *Betterson v. HSBC Bank, USA, N.A.*, No. 11-CV-615, 2015 U.S. Dist. LEXIS 132744, at *30–31 (W.D.N.Y. Sept. 30, 2015).

### 2.     Hired Candidate in Protected Class

Moreover, while also not dispositive, there is an inference against discrimination where the individual hired to replace a plaintiff alleging discrimination is within the same protected class.  *See, e.g., Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d. Cir. 2010) (summary order) (affirming summary judgment in favor of defendant and finding no inference of discrimination where black female plaintiff alleged termination based on race discrimination but she was "replaced by another black female"); *Rodriguez v. N.Y.C. Health & Hosps. Corp.*, No. 14 Civ. 4960, 2015 U.S. Dist. LEXIS 119040, at *14 (E.D.N.Y. Sept. 8, 2015) ("It is extremely difficult, if not practically impossible to establish discrimination where, as here, plaintiff was passed over so an employer can hire another member of plaintiff's same protected class.") (quotation marks omitted); *Cabrera v. N.Y.C.*, 436 F. Supp. 2d 635, 645 (S.D.N.Y. 2006) (finding no inference of discrimination where plaintiff alleged discrimination in failure to promote her and those promoted to the positions in question were in plaintiff's protected class); *Smith v. Planas*, 975 F. Supp. 303, 308 (S.D.N.Y. 1997) (same).  Here, one of the two positions that Plaintiff applied for in June 2011 was filled by another woman, Dr. Zinaida Yel (Def. 56.1 ¶ 107), a fact that further undercuts Plaintiff's claim of gender-based discrimination.

### 3.     No Other Material Evidence of Gender-Based Discrimination

The only other evidence in the record regarding Plaintiff's claim of gender-based discrimination is Plaintiff's assertion that "Joseph Bachner, the Director [at CPC], did not like female employees."  (Dkt. 53 at 3.)  (*But see* Meyer Tr. at 39:11–19 (Plaintiff testified that Bachner "wasn't respectful," but she "didn't know if it was because [she] was a woman or [she]

was the M.D. . . ."").)[25]  Assuming Bachner did not like female employees and was disrespectful to Plaintiff because of her gender, Plaintiff has made no showing whatsoever that this had any effect on *Grandi's* assessment of Plaintiff's candidacy for the two positions for which Plaintiff alleges Defendants discriminatorily failed to hire her in 2011.  Indeed, Plaintiff has admitted that Grandi did not speak with Bachner regarding Plaintiff's job performance.  (Pl. 56.1 ¶ 165.)

Plaintiff admitted that Grandi herself never made any comments to Plaintiff about her gender during Plaintiff's employment with CPC, and she "do[es]n't recall" whether Grandi made any comments to Plaintiff about Plaintiff's gender during the 2011 interview.  (Meyer Tr. at 54:4–6, 172:17–20.)  When asked directly why she "believe[s] that Dr. Grandi discriminated against [her] based on [her] gender," Plaintiff's answer consisted of nothing more than that Plaintiff "just felt that [way]" and "think[s] [Grandi] should have hired [Plaintiff]."  (*Id*. at 199:15–200:4.)  However, Plaintiff's "mere subjective belief that [s]he was discriminated against . . . does not sustain a . . . discrimination claim."  *Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014) (quotation marks omitted).

Considering the totality of the evidence, the Court concludes that Plaintiff has not proffered any evidence that raises a genuine issue of material fact regarding an inference of gender-based discrimination with respect to Defendants' failure to hire Plaintiff in June 2011, and therefore has not made out a *prima facie* case of gender-based discrimination.

B.      Plaintiff's Religious Discrimination Claim: No Discrimination Can Be Established

Plaintiff's claim of religious discrimination fares no better in the end.  Although, under the beneficial standard that applies to summary judgment motions, Plaintiff has proffered

---

[25] Plaintiff's other evidence regarding Bachner's alleged discriminatory conduct have not been considered as it is based on inadmissible hearsay.  *See supra* nn.1, 5.

sufficient evidence to establish a *prima facie* case of religious discrimination, this evidence is insufficient for a jury to ultimately find that Defendants' decision not to hire Plaintiff in 2011 was motivated, in any way, by religious discrimination. Thus, Plaintiff's religious discrimination must be dismissed.

       1.     <u>*Prima Facie* Case</u>

As previously discussed, of the four elements that Plaintiff must establish for a *prima facie* case of discrimination, Defendants only challenge Plaintiff's ability to satisfy the inference-of-discrimination prong.

       a)     <u>Stray Remarks</u>

A plaintiff may raise an inference of discriminatory intent through evidence of overt discrimination, such as discriminatory remarks or conduct. *See Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 93 (2d Cir. 2013). However, "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir. 1998). *See also Palak*, 2015 U.S. Dist. LEXIS 76511, at *19 ("In the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion.").

To determine whether a remark is "probative of discrimination" or merely a "non-probative 'stray remark,'" the Court must "consider factors such as: '(1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process).'" *Sethi*, 12 F.

Supp. 3d at 539 (quoting *Henry v. Wyeth Pharm.*, 616 F.3d 134, 149 (2d Cir. 2010)).  In other words, "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the alleged discriminatory behavior, the more probative that remark will be."  *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 272 (E.D.N.Y. 2013) (quotation marks omitted).

> b)   Grandi's Alleged Remarks During 2011 Interview Give Rise to an
>       Inference of Discrimination

Here, Plaintiff's only evidence of Defendants' alleged religious bias consists of her own testimony about supervisors and co-workers making references to her religion that showed that her coworkers "were aware that [she] was Jewish" and that she "took off for the Jewish holidays, High Holy Days."  (Meyer Tr. at 45:5–14.)  Beyond "stating or mentioning the holidays that [Plaintiff] took off," Plaintiff testified only that there were "reference[s]" made to her Judaism while she was working at CPC, and that just "the reference to it" imbued the environment with "a flavor of anti-Semitism."  (*Id*. at 181:8–24.)  Plaintiff, however, could not recount "any exact statements that were made."  (*Id*. at 182:3–5.)  According to Plaintiff, D'Souza "acknowledged that [Plaintiff] was Jewish" "[d]uring the latter part of [Plaintiff's] employment at [CPC], around Passover in the spring [of 2005]."  (*Id*. at 180:5–24.)  While Plaintiff initially testified that Grandi had never made any comments to Plaintiff about her religion during Plaintiff's employment with CPC (*id*. at 54:10–12), she subsequently testified that both Grandi and D'Souza, at CPC's Christmas party in December 2004, had, in fact, made references to it being "known that [Plaintiff] do[es]n't celebrate Christmas" (*id*. at 200:5–201:4).  Similarly, while Plaintiff initially testified that she did not recall whether there were any statements made during the 2011 interview regarding her religion (*id*. at 189:17–20) and that Grandi had not made any comments about Plaintiff's religion during the 2011 interview, but was merely "well aware from

[Plaintiff's] previous employment at [CPC] that [she] was Jewish and modern orthodox" (*id.* at

172:21–25), Plaintiff subsequently testified that Grandi had made "some reference" "in passing

about [Plaintiff] coming from a Jewish family" during the 2011 interview, though Plaintiff was

"not sure of the specifics" (*id.* at 180:5–24).[26]

On the first prong of the stray remark analysis, *i.e.*, who made the remarks (*e.g.*, a

decision-maker, a supervisor, or a low-level co-worker), the only two individuals actually

identified as having commented on Plaintiff's religion are Grandi and D'Souza.[27] However,

Grandi was the decision-maker in the 2011 hiring process, and her decision was based, at least in

part, on D'Souza's evaluation of Plaintiff's job performance. Therefore, this factor indicates

---

[26] While the Court is skeptical of Plaintiff's contradictory deposition testimony, in which she initially did not recall any references about her religion by Grandi, but later testified to such references, the Court will refrain from making credibility determinations that are more properly left to the jury. *See Jin Dong Wang v. LW Rest., Inc.*, 81 F. Supp. 3d 241, 259 (E.D.N.Y. 2015) ("District courts should not 'engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment.'") (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) and citing cases)). The Court further recognizes that, at this stage, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought," *Carlton*, 202 F.3d at 133. The Court, therefore, assumes for purposes of this motion that Grandi did make these statements, both in December 2004 and in the 2011 interview.

[27] The Court omits from its discussion the statements attributed to Alfarro, made during Plaintiff's time at BPC. (*See* Meyer Tr. at 65:4–66:2 (Alfarro "was aware that [Plaintiff] was Jewish," and made reference to that "[w]ithin the first couple of weeks" of Plaintiff's employment at BPC, though Plaintiff "d[id]n't know the exact" statement, only that Alfarro "made reference"); *id.* at 74:10–20 (Plaintiff "can't give [] specifics," other than that Alfarro "made reference" when Plaintiff "took time off for the High Holy Days that following fall after [Plaintiff] started [at BPC] in July" and that Alfarro "knew [Plaintiff] was Jewish").) (*But see id.* at 71:15–22 (when asked whether "Alfarro ever sa[id] anything to [Plaintiff] about [her] religion," Plaintiff's response consisted solely of "[j]ust that [Alfarro] was negative" and "had poor interaction with other staff, other doctors, female and male, mainly female").) There is no evidence in the record that Alfarro had any input into the 2011 hiring decision; indeed, both parties appear to acknowledge that she did not. Nor is there evidence that anyone else at BPC had input into the 2011 hiring decision. Grandi did not even know that Plaintiff had worked at BPC until Plaintiff told Grandi during the 2011 interview. (Pl. 56.1 ¶¶ 211–14; Def. 56.1 ¶ 102.) Therefore, the Court deems this evidence irrelevant to Plaintiff's religious discrimination claim.

potential probative value of the statements at issue.

On the second prong of the analysis, *i.e.*, when the remark was made in relation to the employment decision at issue, all but one of the statements at issue are far too removed from the alleged discriminatory conduct in 2011 to be probative of discrimination. "Although there is no bright line rule regarding what length of time renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination, courts in this Circuit have generally found that a five month lapse between an allegedly discriminatory statement and an adverse employment action is too long a gap to find the remark probative of discrimination without some other evidence that the remark was related to the adverse employment action." *Ellis*, 975 F. Supp. 2d at 276; *see also Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015) (dismissing gender and age discrimination claims in part because "time lapse between the [allegedly discriminatory] remarks and the adverse employment action suggests that the incidents were not related," where comments were made a year and a half and three months, respectively, before plaintiff's termination); *Yoselovsky v. The Associated Press*, 917 F. Supp. 2d 262, 278 (S.D.N.Y. 2013) (collecting cases); *Del Franco v. N.Y.C. Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 537 (E.D.N.Y. 2006) (no probative value of allegedly discriminatory comment made "slightly more than three months" prior to termination at issue). Clearly, Grandi's reference to Plaintiff coming from a Jewish family in the 2011 interview is close enough in time to have probative value with respect to an inference of religious discrimination regarding the 2011 hiring decision.

As to the third and fourth prongs of the analysis, *i.e.*, the content and context of the remark, respectively, a reasonable juror could find that Grandi's remark about Plaintiff coming from a Jewish family, especially if made *during* the 2011 interview, could be indicative of

religious animus in connection with the 2011 hiring decision.  Though the vague nature of this reference alone would likely be insufficient to give rise to an inference of discrimination, the context, namely, that it was made without an apparent job-related purpose or justification *during* the interview at issue, nudges this remark over the line from stray remark to evidence of discriminatory animus.

Accordingly, based on the totality of these factors, the Court finds that Plaintiff has established a *prima facie* case of religious discrimination with respect to the 2011 hiring decision.  (Dkt. 53 at 16–17 (even a single stray comment "may be [of] more ominous significance when considered with the totality of all the evidence") (citing *Carlton*, 202 F.3d at 135, and *Danzer*, 151 F.3d at 56).)

### 2. Legitimate, Non-Discriminatory Reasons

Because Plaintiff has established a *prima facie* case of religious discrimination, the Court must determine whether Defendants have established legitimate, non-discriminatory reasons for failing to hire Plaintiff for the two positions for which she applied in June 2011.  *Carlton*, 202 F.3d at 136.  The Court finds that Defendants have articulated legitimate, non-discriminatory reasons for this decision, namely, Plaintiff's past poor performance at CPC and superior qualifications of the candidates who were hired.

"An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action."  *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001); *see also Ehrbar v. Forest Hills Hosp.*, No. 13-CV-1761, 2015 U.S. Dist. LEXIS 126248, at *5–7, 49 (E.D.N.Y. Sept. 22, 2015) (defendants proffered "numerous non-discriminatory reasons for firing Plaintiff, all relating to Plaintiff's poor job performance," including poor performance during a period in which plaintiff

received "generally positive annual performance evaluations").  Moreover, employers "ha[ve] discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria."  *Burdine*, 450 U.S. at 259.  That an employer hires an individual with "superior qualifications" to Plaintiff's presents a legitimate, non-discriminatory reason for its failure to hire Plaintiff.  *See Ellis*, 975 F. Supp. 2d at 271; *see also Antunes v. Putnam/N. Westchester Bd. of Coop. Educ. Servs.*, No. 09-CV-3063, 2011 U.S. Dist. LEXIS 54111, at *25–27 (S.D.N.Y. May 19, 2011) (finding that defendants met burden of establishing legitimate, non-discriminatory reason for not hiring plaintiff where they established that the individuals hired instead had "superior qualifications").

Dr. Zinaida Yel, who was hired for the position at CPC's Steinway Clinic, is Board Certified (Def. 56.1 ¶ 107), whereas Plaintiff is not (*id.* ¶ 4).  Defendants view Board Certification as demonstrating "better qualifications" for a medical professional.  (Grandi Decl. ¶ 22.)  Dr. Haniel Shen, who was initially hired for the second position for which Plaintiff applied, at the Assertive Community Treatment Program, had experience managing a large caseload of psychiatric patients.  (Def. 56.1 ¶ 108.)[28]  By contrast, Grandi's assessment of Plaintiff, based on D'Souza's statements to Grandi, was that Plaintiff was generally overwhelmed and disorganized.  (Grandi Decl. ¶ 15.)  Grandi also understood that Plaintiff "could not handle the number of patients she was assigned to."  (Grandi Tr. at 58:12–22.)  The superior qualifications of Drs. Yel and Shen, when compared to Plaintiff's qualifications, are sufficient to establish legitimate, non-discriminatory reasons for Defendants' failure to hire Plaintiff in 2011.

---

[28] Dr. Shen resigned from the position in August 2012, and was replaced by Dr. Alan Jaffe, who is Board Certified.  (Def. 56.1 ¶ 109.)

3.    <u>Pretext</u>

Having successfully put forth legitimate, non-discriminatory reasons for their decision not to hire Plaintiff in 2011, Defendants have rebutted any presumption of religious discrimination created by a *prima facie* case of discrimination. Thus, the lone remaining issue for the Court to determine is whether Defendants' purported justification for their 2011 hiring decision was mere pretext for gender and/or religious discrimination, and that the real reason for the failure to hire was such discrimination. *See James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000); *Weinstock*, 224 F.3d at 42.

Plaintiff's own cited authority (*see* Dkt. 53 at 21) makes clear that "the creation of a genuine issue of fact with respect to pretext alone is not sufficient." *Grady*, 130 F.3d at 561. Rather, "[t]here must also be evidence that would permit a rational factfinder to infer that the [adverse employment action] was actually motivated, in whole or in part, by discrimination . . . ." *Id.* In other words, Plaintiff's "opportunity to demonstrate that [Defendants'] proffered reason was false now merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Bickerstaff*, 196 F.3d at 446–47. Here, there is no evidence that would permit a rational factfinder to infer that Defendants' failure to hire Plaintiff was, in any way, the result of religious discrimination.

Plaintiff focuses on Grandi's determination prior to the 2011 interview that Plaintiff would not be considered for the positions at issue, and the fact that Grandi only interviewed Plaintiff because she was instructed to do so. (Pl. 56.1 ¶¶ 202, 204, 205.) But, even construed in the light most favorable to Plaintiff, this fact does not support any discriminatory motive with respect to Grandi's decision not to hire Plaintiff. Rather, it "suggests that [Grandi] had already

determined that Plaintiff's performance was substandard" based on her prior employment with CPC, and thus "warrant[ed]" Plaintiff not being hired. *See Ehrbar*, 2015 U.S. Dist. LEXIS 126248, at *58–59.

Plaintiff also emphasizes the fact that Grandi told Plaintiff that she was an "excellent candidate," but that CPC was "going to look further." (Meyer Tr. at 198:4–15.) Again, this provides no evidence of discriminatory animus. That Plaintiff might have been an "excellent candidate" does not mean that there were no other candidates who were more qualified than Plaintiff, nor does it indicate that Defendants based their decision on any prohibited factor, such as religion. If anything, Grandi's statement, assuming it was made, is consistent with Defendants' asserted justification of choosing superior candidates over Plaintiff. Relatedly, the fact that Board Certification might not have been a requirement for the positions for which Plaintiff applied (*see* Pl. 56.1 ¶¶ 198, 199) does not undercut Defendants' valuation of such certification as demonstrating superior qualifications, nor does it permit an inference of discrimination, as Plaintiff has provided no nexus between Board Certification and religion.

Moreover, Plaintiff's "disagreement with defendants over whether her behavior [while employed at CPC] was inappropriate does not show that [Defendants'] stated reasons for [not hiring] her were not their true reasons." *Fleming*, 371 F. App'x at 117. That there were no written comments documenting performance issues in the lone evaluation Plaintiff received during her six months at CPC in 2005, or Grandi's inability to explain why Plaintiff was hired to work at another OMH-run hospital, BPC, between 2005 to 2007, does not undercut the fact that Grandi received reports from Plaintiff's direct supervisor, D'Souza, indicating that Plaintiff "could not do her job," and that those reports formed the basis of Defendants' decision not to hire Plaintiff in 2011. (Grandi Tr. at 55:16–23.)

Plaintiff also argues that she can prove a claim of disparate treatment based on the fact that "there were no other female Jewish older psychiatrists." (Dkt. 53 at 16; Meyer Tr. at 206:2–17; Pl. 56.1 ¶ 143.) (*See also* Pl. 56.1 ¶ 142 ("There was only one other Jewish physician with whom Plaintiff worked at OMH."); *id.* ¶ 171 ("There were no other Jewish members on the treatment team [at BPC]."); Meyer Tr. at 64:11–14 (same); *id.* at 46:14–19 (Plaintiff "d[id]n't know of any other Jewish employees" with whom she worked at CPC).) (*But see id.* at 195:13–196:17 (Plaintiff was aware of one Jewish doctor at BPC who "was in charge of the physician union").) However, Plaintiff misapprehends the nature of a disparate treatment claim, which requires her to show that individuals *outside* her protected class, *e.g.*, non-Jewish, who were "similarly situated in all material respects" to Plaintiff, were treated more favorably by the alleged discriminator. *See Shein v. N.Y.C. Dep't of Educ.*, No. 15-CV-4236, 2016 U.S. Dist. LEXIS 20015, at *15–17 (S.D.N.Y. Feb. 18, 2016) (dismissing religious discrimination claim where plaintiff failed to allege that comparators were similarly situated to her); *see also Emmanuel v. Cushman & Wakefield, Inc.*, No. 13-CV-2894, 2015 U.S. Dist. LEXIS 113280, at *18–19 (S.D.N.Y. Aug. 26, 2015) (rejecting plaintiff's disparate treatment argument as "not probative of discrimination" where plaintiff failed to establish that proffered comparators fell outside protected class). Here, Plaintiff has failed to identify any such comparators. Indeed, Plaintiff does not know the religion of either of the individuals who filled the positions for which she applied in 2011. (Meyer Tr. at 189:12–16.) Furthermore, to the extent Plaintiff is arguing that Defendants *categorically* discriminated against Jewish psychiatrists vis-à-vis non-Jewish psychiatrists, she has failed to provide any information about either group to permit a determination of whether Defendants treated Jewish psychiatrists more or less favorably than similarly situated non-Jewish psychiatrists. Thus, Plaintiff cannot establish a disparate treatment

claim with respect to any alleged religious discrimination.

Plaintiff also asserts as evidence her subjective belief that "there was a flavor of anti-Semitism at OMH" (Pl. 56.1 ¶ 150; Meyer Tr. at 181:23–182:2), and that the remarks made by Alfarro at BPC "had the flavor of anti-Semitism" (Pl. 56.1 ¶ 175; Meyer Tr. at 78:19–21). These subjective beliefs, however, are simply insufficient to establish her religious discrimination claim. *Sethi*, 12 F. Supp. 3d at 536 (Plaintiff's "mere subjective belief that [s]he was discriminated against . . . does not sustain a . . . discrimination claim.")

That leaves Grandi's alleged remark during the 2011 interview about Plaintiff's Jewish background as the only evidence of Defendants' alleged religious discrimination with respect to the 2011 hiring decision. This vague comment, however, is simply too thin a reed to support a jury finding of discrimination.[29] The utter lack of specificity or context for this comment provides no basis for attributing a negative sentiment or purpose behind this comment.[30] Indeed, after denying that Grandi had made any comments about Plaintiff's religion during the 2011 interview, Meyer later testified only that Grandi had made "some reference" "in passing about [Plaintiff] coming from a Jewish family," but could not provide any "specifics." (Meyer Tr. at 180:5–24.) Nor does Plaintiff offer any evidence to even suggest that this passing comment

---

[29] Had Plaintiff established a *prima facie* case of gender-based discrimination, the reasons proffered by Defendants for their failure to hire her in 2011 would have served to rebut any presumption of gender-based discrimination, and Plaintiff's evidence of gender-based discriminatory animus, of which there was none, would not have created any dispute of fact as to whether these reasons were mere pretext.

[30] Though, as a matter of process, both CPC's Clinical and Executive Directors were also involved in the 2011 hiring decision, because their decisions were based almost solely on Grandi's recommendation, the Court focuses on Grandi's interview of Plaintiff. (*See* Def. 56.1 ¶¶ 28–30.)

played a role in the 2011 hiring decision.[31]  *See Palak*, 2015 U.S. Dist. LEXIS 76511, at *19 ("In the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion.") (quotation marks omitted); *cf. Abdu-Brisson*, 239 F.3d at 468 (an inference of discrimination "can be drawn from circumstances such as the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action].").

For the foregoing reasons, Plaintiff has failed to meet her burden under the *McDonnell Douglas* framework.  A rational factfinder could conclude nothing more than that Plaintiff has "point[ed] to various ways in which she feels she was mistreated and argu[ed] that it must have been because of her sex . . . or [religion]," but "[t]his not sufficient to sustain a claim of discrimination."  *Campbell v. N.Y.C. Trans. Auth.*, 93 F. Supp. 3d 148, 173 (E.D.N.Y. 2015) (granting defendants summary judgment on plaintiff's Title VII, ADEA, and ADA claims); *see Grady*, 130 F.3d at 561 ("There must also be evidence that would permit a rational factfinder to infer that the [adverse employment action] was actually motivated, in whole or in part, by discrimination . . . .").  Plaintiff's Title VII claims alleging gender-based and religious discrimination are hereby dismissed, with prejudice.

II.      State Law Claims against Defendant Grandi

The Court turns to Plaintiff's remaining claims against Grandi under the NYSHRL and NYCHRL, alleging gender-based, religious, and age-based discrimination.  (Dkt. 11 ¶¶ 60–66

---

[31] As discussed earlier, Plaintiff does not offer any comparator evidence with regard to the religions of the three doctors who were eventually appointed to the positions for which Plaintiff applied.  (Meyer Tr.  at 189:12–16 (Plaintiff does not know the religions of either Dr. Yel or Dr. Shen); Def. 56.1 ¶¶ 108, 109 (Dr. Jaffe replaced Dr. Shen after he resigned in August 2012).)

(Count 2), 67–73 (Count 3), 81–87 (Count 5), 88–94 (Count 6), 102–08 (Count 8), 109–15 (Count 9).)  Typically, where "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (quotation marks omitted); *see also* 28 U.S.C. § 1367(c)(3) (where a court "has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over remaining state law causes of action).

The Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims.[32]  *See Carter v. City of New York*, No. 14-CV-7165, 2015 U.S. Dist. LEXIS 174124, at *55–56 (E.D.N.Y. Dec. 11, 2015), *adopted in full by*, 2016 U.S. Dist. LEXIS 2847 (E.D.N.Y. Jan. 6, 2016) (after dismissing "all federal claims in th[e] action," "declining to exercise supplemental jurisdiction over the NYSHRL and NYCHRL claims and dismissing the same without prejudice"); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 147–48 (E.D.N.Y. 2015) ("declin[ing] to retain jurisdiction over the remaining [NYSHRL] state law claims given the absence of any federal claims that survive summary judgment").  Those claims are dismissed, without prejudice.

*CONCLUSION*

For the reasons stated above, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's Title VII claims, which are dismissed, with prejudice.  Because the

---

[32] While NYSHRL claims are evaluated under the same rubric as Title VII claims, *see Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam), the Court nonetheless declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL claims here, as they have been asserted against a different defendant than Plaintiff's Title VII claims and involve the additional claim of age discrimination, which is not implicated by Plaintiff's Title VII claims.

Court declines to exercise supplemental jurisdiction over Plaintiff's remaining State law claims, those, too, must be dismissed, without prejudice.  The Clerk of Court is respectfully directed to enter judgment consistent with this Order.

                                        SO ORDERED:


                                         /s/ Pamela K. Chen
                                        PAMELA K. CHEN
                                        United States District Judge

Dated: March 28, 2016
        Brooklyn, New York